**Not for Publication in West's Federal Reporter**

# United States Court of Appeals
## For the First Circuit

No. 19-1708

HAROLD HOURIHAN,

Plaintiff, Appellant,

v.

ROBERT BITINAS; ANDREW MCKENNA,

Defendants, Appellees,

TOWN OF BARNSTABLE, MASSACHUSETTS; PAUL MACDONALD,

Defendants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]
[Hon. Indira Talwani, U.S. District Judge]

---

Before

Kayatta, Circuit Judge,
Souter,* Associate Justice,
and Selya, Circuit Judge.

---

Richard K. Latimer for appellant.
Stephen C. Pfaff, with whom Louison, Costello, Condon & Pfaff,
LLP was on brief, for appellees.

---

April 22, 2020

---

* Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation

**SOUTER**, **Associate Justice**.  Plaintiff Harold Hourihan appeals from adverse judgments in his § 1983 and state law action against appellees Robert Bitinas and Andrew McKenna, among other defendants.  He assigns error to the district court's award of partial summary judgment to appellees and, following an adverse jury verdict, the denial of his motion for judgment as a matter of law or alternatively for a new trial.  We affirm.

I

A reasonable jury could have credited the following testimony presented at trial.  On September 3, 2013, Officer Bitinas of the Barnstable Police Department received a dispatch from headquarters that a Reporting Party (R.P.) was "requesting a wellness check" on her parents' neighbor, Harold Hourihan.  According to the R.P., Hourihan had called her making several "bizarre statements [suggestive of] a mental breakdown," including assertions that "people are shooting BB guns in his back yard" and that "he believes the State Police are in his attic spying on him."  Trial Ex. 35.  She believed Hourihan "to have accidentally discharged firearms in his home in the past, but [did] not know if he still possess[ed] weapons."  Id.  The dispatch further noted that Hourihan had an unexpired license to carry a gun.  Officer Bitinas was concerned that the subject was having a mental breakdown while in possession of firearms, and accordingly proceeded to Hourihan's residence.

Upon arrival, Officer Bitinas met Hourihan and a friend, Daniel Parker, at the door.  He asked them to step out to the deck, which they did, and he observed that Hourihan was cooperative and polite when speaking with him.  He noticed, however, that Hourihan was wearing a gun holster that appeared to be empty.  When Officer Bitinas enquired about the holster, Hourihan said that the gun belonging in it was upstairs on his bed, and that he also had a shotgun stored beneath the bed.  Officer Bitinas asked whether he could "go up and make those weapons safe," to which Hourihan replied "Yes."

The officer conducted a protective sweep of the house before going into Hourihan's bedroom, where he found a loaded pistol on the bed and a loaded shotgun inside a latched gun case beneath the bed.  Though he noticed several other gun cases there, he cleared the ammunition only from the pistol and the shotgun.  He then went downstairs to meet Sergeant McKenna, who had just arrived, and told the Sergeant what he had found.

Hourihan began telling Sergeant McKenna about an ongoing dispute he had with his neighbor, Robert Dawson.  Hourihan said that Dawson would walk around his own yard in camouflage, at times lying in a prone, sniper-like position on his roof or under his deck to shoot poison-laced pellets at Hourihan's house and vehicle.  Hourihan said that some of these bullets would ricochet off other parked vehicles and go around his house to cause damage to items

hidden behind it. He showed Sergeant McKenna certain marks on his body that he attributed to Dawson's bullets. Sergeant McKenna walked to the vicinity of Dawson's property, noting the substantial distance between the two houses, the fence in front of Hourihan's residence, and the particular shooting positions Hourihan had described. Based on these observations, Sergeant McKenna found aspects of Hourihan's story to be implausible.

Back at Hourihan's house, Sergeant McKenna conversed again with Hourihan, whose mood began to fluctuate. Believing Hourihan to be in "crisis," Sergeant McKenna encouraged him to speak with someone at a hospital. Hourihan mulled this over and agreed, whereupon Sergeant McKenna called the Hyannis Fire Department to provide transportation. He then asked Hourihan whether there were more firearms in his house, and whether the officers could reenter it to make those weapons safe. Hourihan gave the officers permission to go in, and indicated that there were other guns under his bed and in one of the top two drawers in his dresser. Because Barnstable Police Department policy prohibited officers from leaving unsecured weapons at the home of someone being transported for a mental health evaluation, Sergeant McKenna told Hourihan that the officers would take charge of his guns for safekeeping.

Upon hearing this, Hourihan's mood changed. He became agitated and argumentative, moving around erratically without

- 4 -

heeding the officers' requests to calm himself. Sergeant McKenna told Hourihan that though he was not under arrest, they were going to handcuff him for his own safety. Officer Bitinas handcuffed Hourihan, and Sergeant McKenna guided him into the rear of the police cruiser, where he sat until an ambulance arrived. He was then strapped to a gurney in the back of the ambulance, had his handcuffs removed, and was taken to the hospital (apparently unaccompanied by any officer).

Officer Bitinas returned to Hourihan's bedroom and found six firearms and four pellet guns, all in unlocked containers or canvas bags. None had trigger locks. He removed and unloaded each gun, took ammunition found beneath the bed, and held onto a container of unlabeled pills found in the case of one of the seized weapons. He was then joined by Sergeant McKenna and another officer, who photographed the guns.

On August 25, 2016, Hourihan brought the present action in federal district court against Officer Bitinas, Sergeant McKenna, Chief Paul MacDonald of the Barnstable Police Department, and the Town of Barnstable. He charged Bitinas, McKenna, and MacDonald (in their individual capacities only) with committing the torts of false arrest, false imprisonment, and intentional infliction of emotional distress, and with liability under provisions of state law (Mass. Gen. Laws ch.12, §§11H, 11I), and 42 U.S.C. § 1983, for violating Hourihan's state and federal

constitutional rights.  He also named the Town of Barnstable as liable for negligent supervision and training.

On June 27, 2018, the district court (Burroughs, J.) awarded partial summary judgment to the defendants.  So far as relevant here, the court concluded that Officer Bitinas and Sergeant McKenna were entitled to qualified immunity with respect to their warrantless entry into Hourihan's residence.  The court dismissed most of the claims against MacDonald and the sole claim brought against the Town of Barnstable.  Hourihan's remaining claims, including those against the two officers for searching for and/or seizing his guns following each entry, restraining him in the cruiser, and transporting him to the hospital, proceeded to trial.

At the close of evidence, Hourihan moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a).[1]  The trial judge (Talwani, J.) nonetheless submitted the case to the jury subject to the court's later consideration of the legal questions raised by the motion.  The jury found in favor of Officer Bitinas and Sergeant McKenna on all claims.  Hourihan then filed what the district court construed to be a renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure

---

[1] The trial judge had earlier granted Chief MacDonald's motion for judgment as a matter of law after the plaintiff rested, a decision that has not been appealed.

50(b) and, alternatively, for a new trial under Federal Rule of Civil Procedure 59.[2]  The court denied the motion, and this appeal followed.

## II

We review the district court's denial of the motion for judgment as a matter of law de novo, and "examin[e] the evidence and reasonable inferences therefrom in the light most favorable to the nonmovant."  Estate of Berganzo-Colón ex rel. Berganzo v. Ambush, 704 F.3d 33, 38 (1st Cir. 2013).  Thus, we "may only grant a judgment contravening a jury's determination when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party."  Marcano Rivera v. Turabo Med. Ctr. P'ship, 415 F.3d 162, 167 (1st Cir. 2005) (quoting Rivera Castillo v. Autokirey, Inc., 379 F.3d 4, 9 (1st Cir. 2004)).

We review a district court's denial of a motion for a new trial for abuse of discretion.  Mejías-Aguayo v. Doreste-Rodríguez, 863 F.3d 50, 54 (1st Cir. 2017). "A new trial may be warranted if 'the verdict is against the weight of the evidence' or if 'the action is required in order to prevent injustice.'" Jones ex rel. U.S. v. Mass. Gen. Hosp., 780 F.3d 479, 492 (1st

---

[2] "[A] renewed motion for judgment as a matter of law . . . may include an alternative or joint request for a new trial under Rule 59."  Fed. R. Civ. P. 50(b).

Cir. 2015) (quoting Jennings v. Jones, 587 F.3d 430, 436 (1st Cir. 2009)).

We consider first those claims raised in plaintiff's unsuccessful pretrial motion under Rule 50(a) for judgment against Bitinas and McKenna, which he renewed under Rule 50(b) after the jury's verdict. The issues so raised turn on findings of fact that were the subjects of special questions submitted to the jury, upon which the trial judge relied in her carefully explained denial of the post-trial motion.

The first of these claims of error challenges the district court's conclusion that the jury could reasonably find on the evidence that Officer Bitinas did not violate the Fourth and Fourteenth Amendments (and the state constitutional analogue) when he first proceeded to the plaintiff's bedroom to disarm the two guns plaintiff had mentioned. The jury made a special finding that the officer's search for the gun on top of Hourihan's bed was justified either by plaintiff's consent or as a reasonable measure to guard against a risk of imminent violence. The jury found that the officer's search beneath plaintiff's bed was likewise justified by consent, risk of imminent harm, or, as a third possibility, that the area searched was in plain view of a permissible search.

We need not address each of these alternative bases, however, as the record is so overwhelming on the fact of consent

that it is "reasonably likely" the jury relied on this ground. Rodríguez-García v. Miranda-Marín, 610 F.3d 756, 772 n.17 (1st Cir. 2010) (quoting Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 73 (1st Cir. 2009)). Officer Bitinas testified that the plaintiff gave his permission for the police to enter his house in order to reach the handgun and shotgun and "make those weapons safe." The officer then went to the location of the guns described and made safe only those two guns that were mentioned. Indeed, he could not have known that the shotgun was in the case unless he had already been informed of its location, and though he saw other encased guns in the room, he chose not to search them. Such testimony strongly suggests that the jury relied on consent, and that such reliance was justified.

The plaintiff makes no claim that he was not allowed to introduce any evidence or make any argument he wished relating to the fact or adequacy of consent, and we have heard no significant argument here to the effect that the jury lacked a reasonable evidentiary basis to accept Officer Bitinas's testimony. The plaintiff says that he was entitled to judgment as a matter of law on this issue of consent by asserting that Officer Bitinas could not lawfully seek consent in the first place, see Brief of Appellant 25, but no authority supports this proposition.[3]

---

[3] He also argues that any apparent consent was inadequate owing to Officer Bitinas's obscurity in describing the object of

The next claim before us is one of error in denying a Rule 50(b) judgment for the plaintiff on Fourth Amendment and state law claims of unconstitutional search when Officer Bitinas, joined by Sergeant McKenna, proceeded into the house a second time to examine the guns that plaintiff had told them were under his bed and in his dresser drawer. Here, too, the jury made special findings in the alternative: consent, reasonable belief of imminent harm, or plain view. The court found a sufficient evidentiary basis for both consent and reasonable prudence in acting. It is noteworthy, however, that three further considerations pointed to the good judgment supporting the officers' actions in making this second search. The first was the sensible general rule of the Barnstable Police Department, that when firearms are subject to the custody of a person being held for a mental health evaluation, all of them should be secured from him. Next, several of the gun cases in the bedroom had been in plain view during the first search. Finally, the earlier evidence of plaintiff's delusional mind had been significantly confirmed in the conversation the plaintiff had with Sergeant McKenna shortly after the first search occurred. Although the plaintiff said nothing about the state police in the attic, he described in detail

_____

his entry as making the guns "safe." But the jury heard the testimony and had a clear basis to find the consent adequately knowing.

- 10 -

how a neighbor supposedly shot at him and his house with a pellet gun, showed what he said were wounds so caused, explained how pellets were supposedly deflected around the exterior of his house, and described the places in the neighbor's property from which the pellets were supposedly fired. Sergeant McKenna went over to the neighbor's house, checked the shooting locations the plaintiff had identified, and found it highly unlikely as a physical matter that shots from those positions could have had the results plaintiff had described. Hence, the known indications of paranoid delusions were now greater, and police protective action even more obviously called for than the police had realized at the end of the first search.

As to the next claim, of unconstitutional seizure of the guns and other property, the jury found as it had on the preceding claim: consent, a reasonable belief of imminent harm, or plain view. The trial court did not find the conclusion of consent supportable by the record in this instance but denied the plaintiff relief under Rule 50(b) on the evidence already mentioned providing the jury with an objectively reasonable basis to sustain precautionary seizure of the guns, some ammunition, and a bottle of pills found with the guns. For the reasons also mentioned before, we find the court's judgment sound. We add that support for the seizures in the Police Department's prudent policy of securing all guns when the owner is facing a mental health

examination became all the stronger in light of the testimony that as the proceedings wore on, the plaintiff became more upset. Because the police could not be sure when he might be allowed home again, it became more imperative to preclude (at least temporarily) his access to firearms left in the house.

With respect to plaintiff's Rule 50(b) claims of constitutional violations in being handcuffed in the police cruiser and taken under restraint in the ambulance to the hospital where he was examined, the jury's finding again was in favor of the defendant officers. In addition to the support for these conclusions in evidence already mentioned, there was testimony from the officers that the plaintiff was by this point becoming increasingly agitated. There was thus adequate support for concluding that the defendant officers acted with reasonable concern for safety in restraining his freedom of motion.

The same may be said of the evidence, and inferences fairly drawn from it, considered in reviewing the jury's rejection of the plaintiff's state law claims of false arrest, false imprisonment, and intentional infliction of emotional distress. In sum, there was no error in the district court's conclusion that (with the one non-dispositive exception mentioned) the record supports sufficient jury findings to justify denial of the plaintiff's Rule 50(b) motion.

Finally, we consider plaintiff's appeal of the court's pretrial order granting summary judgment in favor of the defendant officers on the issue of their warrantless entry into the house. The court sustained claims of the officers' qualified immunity under the then-unsettled scope of the community caretaking doctrine validating a limited class of searches and seizures. See MacDonald v. Town of Eastham, 745 F.3d 8, 13 (1st Cir. 2014) ("This court has not decided whether the community caretaking exception applies to police activities involving a person's home.").[4]  We find no error in the summary judgment, and note, additionally, that the lawfulness of Officer Bitinas's initial entry is confirmed by the adequate trial evidence that plaintiff gave him consent to enter in order to make safe the weapons described.[5]  Thus, even if we assume for argument's sake that the summary judgment was for some reason defective, any error was harmless.

We therefore affirm the summary judgment and denial of the plaintiff's motion for judgment or new trial under Rule 50(b) and Rule 59.

---

[4] We note that this Court has now resolved the caretaking question in favor of application to private residences. See Caniglia v. Strom, 953 F.3d 112, 118 (1st Cir. 2020).

[5] The district court's Rule 50(b) decision similarly concluded that "the facts presented at trial undermined rather than strengthened Plaintiff's unlawful entry claim."  App. to Brief of Appellant A-65.